FILED

2006 Jan-26  AM 11:51
U.S. DISTRICT COURT
N.D. OF ALABAMA



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| **LAURA GUNN,** | ] |
| **PLAINTIFF,** | ] |
| | ] |
| | ] |
| **v.** | ]**Case No. CV-03-VEH-0357-NE** |
| | ] |
| | ] |
| **TARGET  CORPORATION,** | ] |
| **DEFENDANT.** | ] |
| | ] |

## Opinion

This Court has before it the April 22, 2004, motion of Defendant Target

Corporation's ("Target") for summary judgment as to Plaintiff Laura Gunn's

claims.  (Doc. 45)  For the reasons set forth below, the Defendant's motion is due

to be denied as to Plaintiff's federal and state discrimination claims.

## I.  Procedural History

Plaintiff Laura Gunn commenced this action on February 19, 2003, by

filing a complaint in this Court alleging violations of Title VII of the Civil

Rights  Act  of  1964,  as  amended,  42  U.S.C.  §  2000e  et seq., the  Age

Discrimination in Employment Act, 29 U.S.C. **§**621**,** et seq., and the laws of the

State of Alabama, specifically, the Alabama Age Discrimination in Employment Act, Ala. Code §25-1-20 et seq.  Plaintiff Gunn alleges in her complaint that she was subjected to disparate treatment based on age and gender because the Defendant treated younger male employees differently and more favorably than older female employees by giving younger male employees preferential work areas and assignments.  Plaintiff Gunn also alleges that she was ultimately wrongfully discharged based on age and gender.

On April 22, 2004, the Defendant filed a motion for summary judgment asserting: (1) that Plaintiff Gunn cannot produce any direct evidence of discrimination based on age and gender; (2) that Plaintiff Gunn has failed to establish a prima facie case of disparate treatment based on age and gender; (3) that even if Plaintiff Gunn has established prima facie cases as to her disparate treatment claims based on age and gender, Plaintiff Gunn has failed to rebut the Defendant's legitimate, non-discriminatory, and non-retaliatory reasons for its employment decision.

The Defendant has submitted evidence[1]  in support of its motion for

---

[1] The Defendant submitted the depositions of Plaintiff Laura Gunn with attached exhibits, Mark Wagner with attached exhibits, and Chris Fiscus with attached exhibits. The Defendant also submitted declarations by Pam Taylor with attached exhibits, Mark Wagner with attached exhibits, Toni Mobley with attached exhibits, Charles Todd Burger with attached exhibits, and Catina Terry with attached exhibits.

summary judgment and filed a supporting brief on April 22, 2004. On May 25, 2004, the Plaintiff filed a brief and evidence[2] in opposition to the Defendant's motion for summary judgment. The Defendant filed a reply brief on June 10, 2004.

## II. Standard of Review

## A. Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to

---

[2] The Plaintiff submitted the depositions of Plaintiff Laura Gunn with attached exhibits, Mark Wagner with attached exhibits, and Chris Fiscus with attached exhibits. The Defendant also submitted an affidavit by Linda Brannon. The Plaintiff also submitted Group After-the-Fact Productivity Reports and Individual After-the-Fact-Productivity Reports.

go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant.  Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e.

facts that would entitle it to a directed verdict if not controverted at trial. Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial. The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. Fitzpatrick, 2 F.3d at 1115-16. If the movant meets its initial burden by using

this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Facts[3]

Plaintiff Laura Gunn (DOB 5/13/52, Age 50)[4] began working for defendant Target Corporation ("Target") on March 11, 2002 at its Distribution Center in Madison, Alabama.[5] (Def. Ex. A, p. 144 & Def. Ex. 21; Def. Ex. D, ¶ 2 & Ex. 2). At the time Target hired Plaintiff, she was 49 years old. (Def. Ex.

---

[3]   Plaintiff did not set forth a statement of allegedly undisputed relevant material facts. Plaintiff noted in her brief that the material facts of the case are in dispute. Material facts that were not specifically identified as disputed in the Plaintiff's brief are assumed to be undisputed. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are presented in the light most favorable to the Plaintiff.

[4] The "age" references throughout this brief are primarily as of May 2002, when plaintiff was employed with Target. If a Target teammate was hired after May of 2002, the age reference is to the teammate's age at that date of hire.

[5] Prior to coming to work for Target, plaintiff worked primarily in nurseries gardening and in horticulture sales (Def. Ex. A, pp. 56-60). Just prior to coming to work for Target, plaintiff was a caretaker for her mother-in-law (Def. Ex. A, p. 60).

A, p. 69). Plaintiff began working as a Warehouse Worker in the Inbound (also called Receiving) department unloading goods and merchandise (called freight) from truck trailers for storage until it was shipped to Target stores. (Def. Ex. A, pp. 67-68; Def. Ex. C, p. 193; Def. Ex. D, ¶ 2; Def. Ex. E, ¶ 3). Plaintiff began working as a Warehouse Worker in the Inbound department unloading goods and merchandise (called freight) from truck trailers for storage until it was shipped to Target stores. (Def. Ex. A, pp. 67-68; Def. Ex. C, p. 193; Def. Ex. D, ¶ 2; Def. Ex. E, ¶ 3). Plaintiff earned $10.00 per hour and worked second shift, consisting of four ten-hour shifts Tuesday through Friday. (Def. Ex. A, pp. 67-68, 206; Def. Ex. C, p. 193).

In an effort to familiarize and train new teammates (Target's word, along with team member, for employee) on their job functions and responsibilities, new teammates, like Plaintiff, go through a 90-day probationary period (also referred to as a learning period). (Def. Ex. A, p. 233; Def. Ex. C, pp. 11-12; Def. Ex. D, ¶ 4 & Ex. 3). During this period, both the teammate and Target have an opportunity to determine whether the working relationship is a good match and mutually beneficial. (Def. Ex. D, ¶ 4 & Ex. 3). If the teammate is not content with the employment relationship, he or she is free to terminate their employment. (Def. Ex. D, ¶ 4 & Ex. 3). Likewise, if a Group Leader

(Target's word for supervisors of Warehouse Workers) is not satisfied with a teammate's performance, the teammate's employment will be terminated. (Def. Ex. D, ¶ 4 & Ex. 3). With respect to attendance during the 90-day probationary period, Target policy provides that any combination of three absences or tardies may result in termination; however, personal circumstances resulting in absences or tardies are reviewed and evaluated on an individual basis. (Def. Ex. D, ¶ 4 & Ex. 4). After a teammate completes the 90-day probationary period, any discipline or termination is administered under the Counseling and Corrective Action policy, Target's progressive discipline policy. (Def. Ex. D, ¶ 5). Teammates working in the 90-day probationary period are not subject to this progressive discipline policy. (Def. Ex. D, ¶ 5).

When Plaintiff was first hired, Plaintiff attended Target's orientation and was issued Target's employee handbook. (Def. Ex. A, pp. 70-73 & Def. Ex. 9). Plaintiff's orientation lasted approximately two weeks, and during that time, the contents of the employee handbook were reviewed and discussed. (Def. Ex. A, pp. 72-73). Target's Distribution Center employee handbook provides: "Employment practices at Target will be implemented without regard to race, color, national origin, sex (including pregnancy), religious beliefs, age, disability, sexual orientation, citizenship status, military status, or any other

basis protected by federal, state, or local fair employment practice laws." (Def. Ex. D, ¶ 3 & Ex. 2). During the first weeks of her employment with Target, Plaintiff attended both group and one-on-one training with a number of different trainers on how to conduct her job in the Inbound department. (Def. Ex. A, pp. 77-78).

Plaintiff's supervisor was Mark Wagner (DOB 7/23/60, Age 41), a retired naval officer and Inbound Group Leader with Target who started in September of 2000. (Def. Ex. A, p. 68; Def. Ex. B, pp. 9-10; Def. Ex. H, ¶ 1). Group Leader Todd Burger  (DOB 6/30/71, Age 30) worked on the same shift in the Inbound Department as Wagner. (Def. Ex. B, p. 98; Def. Ex. C, p. 30; Def. Ex. E, ¶ 1). Wagner and Burger reported to Senior Group Leader Steve Smith (DOB 11/26/60, Age 41). (Def. Ex. B, p. 11; Def. Ex. D, ¶ 2; Def. Ex. E, ¶ 2). Burger and Wagner had a different set of employees reporting to them in the Inbound[6] department and each supervised approximately one-half of the group of employees.   (Def. Ex. B, pp. 98-99, 148-149; Def. Ex. E, ¶ 2). Wagner and Burger did not review the performance of each other's teammates. (Def. Ex. B, p. 238; Def. Ex. E, ¶ 2). As with any member of management, if either Wagner or Burger observed an employee not following Target policies,

_____

[6] In the Inbound department, Warehouse Workers unload goods and merchandise from truck trailers to store at the Distribution Center until it is shipped to Target stores. (Def. Ex. E, ¶ 3).

either Group Leader could address the situation.  (Def. Ex. B, p. 99; Def. Ex. C, pp. 31-32; Def. Ex. E, ¶ 2).  If either Burger or Wagner were out at the time for paperwork to be signed by a Group Leader, either could sign off on any paperwork.  (Def. Ex. B, pp. 98-99; Def. Ex. C, pp. 30-31; Def. Ex. E, ¶ 2).  For example, with a teammate's training documents, either Group Leader could initial that the form was properly completed, even though the Group Leader did not supervise that particular teammate.  (Def. Ex. B, pp. 316-317 & Ex. 49; Def. Ex. E, ¶ 2).

While Warehouse Workers in the Inbound department are unloading goods and merchandise (called freight) from the trailers, they work using TelXons, which are hand-held machines that record the freight the workers unload each shift based on their time logged in with their unique user Ids. (Def. Ex. A, p. 79; Def. Ex. E, ¶ 3).  The TelXons transmit information to Target's production system and a Warehouse Worker's productivity is tracked from this information, as well as the entry of the hours worked by the Warehouse Worker each shift. (Def. Ex. E, ¶ 3).  In order to assist Warehouse Workers in learning their jobs, Burger, along with input from Steve Smith and Wagner, created an expectation sheet that outlined the productivity percentage

that was required of each teammate during their probationary or learning period. (Def. Ex. B, pp. 89-91;  Def. Ex. E, ¶ 4 & Ex. 1).  This expectation sheet also outlined other areas of performance, such as attendance, that were expected of teammates during their probationary period. (Def. Ex. E, ¶ 4 & Ex. 1).  Under these expectations, the Warehouse Workers ramped up from 50% of standard to 100% of standard expected productivity over a six-week period (Def. Ex. B, p. 132; Def. Ex. E, ¶ 4 & Ex. 1).  For example, the first week productivity was tracked, the teammate was expected to perform at 50% of standard and the next week at 60% of standard and so on until ramping up to 100% (Def. Ex. B, pp. 132, 141; Def. Ex. E, ¶ 4 & Ex. 1).  If an employee met the 50% standard for the first week productivity was tracked, the employee was considered to have reached 100% of standard for that week.  (Def. Ex. B, p. 211).  Plaintiff does not dispute Target's requirement of productivity standards for its probationary employees (Def. Ex. A, pp. 215-216, 232-233 & Pl. Ex. 11).  The After the Fact Productivity Information Reporting System captures productivity information and automatically exports the information to Excel on a daily or weekly basis for the purposes of creating line graphs.[7]  (Exhibit G,

---

[7] The Defendant asserts that Burger came up with the idea of informally tracking productivity using Microsoft Excel.  In an effort to try to develop a system for reviewing a

Bates No. Target/Gunn 0564).

## Productivity Standards[8]

During Plaintiff Gunn's employment with Target, Plaintiff Gunn asserts that Wagner was aware that Plaintiff was exceeding Target's productivity standards.[9]  Nevertheless, the Defendant asserts that it did not discover until this litigation and after Plaintiff Gunn's termination that there were inadvertent errors in the inputting of information reflecting Plaintiff Gunn's weekly productivity for the weeks beginning April, 2002, May 12, 2002, and May 19, 2002.  (Def. Ex. B, pp. 25, 227-228; Def. Ex. C, pp. 58, 60, 134, 165; Def. Ex.

teammate's productivity during their probationary or learning period, Group Leader Burger came up with the idea of utilizing a line graph in Microsoft Excel that compared the teammate's productivity with the ramp up expectation (Def. Ex. E, ¶ 5).  This was not a formal system, but rather a simple way for a Group Leader to have a visual representation of how a teammate was performing with respect to productivity expectations. (Def. Ex. E, ¶ 5).  In order to create such a graph, a Group Leader would locate information regarding a teammate's productivity on the After the Fact Productivity reporting tool and then input the weekly numbers into the Excel program that then generated the graph (Def. Ex. B, pp. 29-34; Def. Ex. E, ¶ 5).  These line graphs were not formal documents to be maintained in a teammate's personnel file and were only used for teammates in their probationary period and not for teammates who had successfully completed that period (Def. Ex. B, pp. 37-38; Def. Ex. C, pp. 176-177; Def. Ex. E, ¶ 5).

[8] The Defendant moved the Court to strike the bar graph ("bar graph") attached to Plaintiff's Brief in Opposition to Defendant's motion for summary judgment.  (Doc. 59)  The Court finds that Plaintiff's bar graph is irrelevant because the Defendant did not review a probationary teammate's performance for three weeks, but rather reviewed a teammate's performance for their entire probationary period.  Therefore, the Plaintiff's three-week average bar graph is irrelevant. The Defendant's motion to strike (Doc. 59) the bar graph  is granted.

[9] The Defendant disputes that it was aware that Plaintiff Gunn was exceeding Target's productivity standards.  The Defendant asserts that Wagner understood that Plaintiff Gunn's weekly productivity as compared to the expected productivity was as reflected on the chart below.

D, ¶ 7).   The mistakes reflected that plaintiff's productivity for the week beginning April 21, 2002 was 79.89% when it was actually 81.91%, that plaintiff's productivity for the week beginning May 12, 2002 was 76.25% when it was actually 105.84%, and that plaintiff's productivity for the week beginning May 19, 2002 was 76.25% when it was actually 78.02% (Def. Ex. B, pp. 25-26 & Exs. 8, 16; Def. Ex. C, pp. 166-167 & Exs. 8, 15; Def. Ex. D, ¶ 7).   The weekly productivity for Plaintiff Gunn as provided by the Defendant is depicted in the chart below.

|  | EXPECTATION | GUNN'S WEEKLY PRODUCTIVITY RELIED ON BY DEFENDANT | CORRECTED WEEKLY PRODUCTIVITY OF GUNN |
|---|---|---|---|
| 3/30 | 50% | 81.85% |  |
| 4/6 | 60% | 41.30% |  |
| 4/13 | 70% | 51.52% |  |
| 4/20 | 80% | 67.35% |  |
| 4/27 | 90% | 79.89% | 81.91% |
| 5/4 | 100% | 75.37% |  |
| 5/11 | 100% | 72.97% |  |
| 5/18 | 100% | 76.25% | 105.84% |
| 5/25 | 100% | 73.65% | 78.02% |

As a result of the Defendant's initial reliance on inaccurate information

reflecting Plaintiff Gunn's weekly productivity, Plaintiff Gunn believes that all the After the Fact Productivity information now produced by the Defendant is inaccurate.

On April 25, 2002, Wagner provided Plaintiff with her 45-Day Performance Appraisal that indicated Plaintiff needed to improve her productivity (Def. Ex. A, p. 121-123 & Def. Ex. 15; Def. Ex. B, pp. 121-122). In mid-April of 2002, Wagner talked to Plaintiff about her productivity and explained to Plaintiff that she needed to improve her productivity since it was below expectations  (Def. Ex. A, pp. 52, 114).  In addition to not meeting productivity expectations, Plaintiff had other performance problems, such as miscounting pallets, for which Wagner counseled her (Def. Ex. A, pp. 113, 169-170).  After being counseled by Wagner about her failure to meet Target's productivity standards, Plaintiff  consulted with her coworkers who were meeting Target's productivity standards and these coworkers provided Plaintiff with support (Def. Ex. A, p. 186).

Based on the inaccurate weekly productivity information for Plaintiff Gunn, Wagner allegedly understood that Plaintiff's productivity had not increased after her April performance appraisal and observed that Plaintiff's

overall productivity trend for her entire employment was below expectations (Def. Ex. B, pp. 17-18, 21-22, 25, 65-67 & Ex. 16).  After obtaining approval from Steve Smith, Wagner finalized the decision on May 23, 2002 to allow Plaintiff  to voluntarily resign and to have Plaintiff  explore options in other departments within Target (Def. Ex. A, p. 135; Def. Ex. B, pp. 21-22, 25, 50-51, 59-61; Def. Ex. C, p. 40; Def. Ex. H, ¶ 2).  Although it is rare to allow a probationary employee this option, Wagner made the decision to afford Plaintiff this opportunity based on her good attitude, record with safety, and teamwork (Def. Ex. B, pp. 21, 25; Def. Ex. H, ¶ 2).  On her last day of employment with Target, May 23, 2002, Plaintiff met with Mark Wagner and, according to Plaintiff, Wagner informed her that he "was going to have to let her go" (Def. Ex. A, p. 132; Def. Ex. D, ¶ 2).  Plaintiff claims that Wagner told her that though her numbers were improving, "we don't think you are physically capable of maintaining these numbers.[10]" (Def. Ex. A, p. 132).  Plaintiff was surprised by Wagner's alleged comment because the comment did not fit with her observations about Target (Def. Ex. A, p. 176).  When Wagner allegedly made the comment about Plaintiff being unable to maintain the level

---

[10] Wagner adamantly denies making this or any similar comment (Def. Ex. B, pp. 294-295, 298-302).

of productivity, he did not tell Plaintiff why he thought so (Def. Ex. A, p. 185). During this meeting with Wagner, Plaintiff signed a form entitled Voluntary Termination and wrote on the form that she decided to obtain a job in a different department. (Def. Ex. A, pp. 130-131 & Def. Ex. 18).   At the conclusion of this meeting, Wagner offered to assist Plaintiff in obtaining a job in another department at Target. (Def. Ex. A, pp. 132; Def. Ex. H, ¶ 3). Wagner wrote Plaintiff a recommendation letter in order to assist Plaintiff in finding another job with Target. (Def. Ex. H, ¶ 3 & Ex. 1).  Plaintiff chose not to follow up with Wagner about possibly working in another department at Target. (Def. Ex. A, p. 134).  After leaving Target, Plaintiff did not apply for a job at any other company. (Def. Ex. A, p. 167).

As noted above, the Defendant relied on inaccurate weekly productivity information regarding Plaintiff Gunn.  The Defendant asserts that had Wagner known that Plaintiff's productivity was over 100% the week prior to the decision to allow her to voluntarily resign, Wagner would not have changed his decision because Plaintiff was consistently trending below standard, except for that one week period (Def. Ex. B, pp. 67-68).  On September 6, 2002, Plaintiff filed an EEOC Charge alleging that she was terminated from her employment

with Target based on her age and gender (Def. Ex. A, pp. 136-137 & Def. Ex.

19).   The EEOC issued a Dismissal and Notice of Right to Sue letter on

December 3, 2002 (Def. Ex. A, pp. 142-144 & Def. Ex. 20).   The only

comment Plaintiff attributes to her age or gender was the comment by Wagner

(Def. Ex. A, pp. 150-151).

**<u>Other Probationary Employees Terminated During Probationary Period</u>**

Plaintiff understands that Target employees Linda Brannon and Loria

Comerford were also terminated from their employment. (Def. Ex. A, pp. 135-

136).   Both plaintiff and Loria Comerford (DOB 3/24/51, Age 51), who also

reported to Wagner, had the same performance issue with basic functions of the

Warehouse Worker job that were noted by their trainer and documented by

Wagner. (Def. Ex. B, pp. 323-325 & Ex.50; Def. Ex. D, ¶ 2 & Ex. 1; Def. Ex.

F, ¶ 6; Def. Ex. H, ¶ 3 & Ex. 2).   Comerford completed a Voluntary

Termination form one month after coming to work at Target, indicating that

she was seeking another position. (Def. Ex. B, p. 321; Def. Ex. H, ¶ 3 & Ex. 2).

Linda Brannon (DOB 9/10/49, Age 52) reported to Todd Burger and her

employment was terminated on May 24, 2002 (Def. Ex. B, pp. 98-100; Def.

Ex. C, pp. 183-184; Def. Ex. D, ¶ 2 & Ex. 1; Def. Ex. E, ¶ 10).   During her

probationary period, Brannon incurred multiple safety violations and exhibited problems with the quality of her work. (Def. Ex. E, ¶ 10).  Since Brannon was performing below productivity expectations, Burger offered her additional assistance through working with a trainer; however Brannon refused this assistance (Def. Ex. E, ¶ 10).  Based on the combination of Brannon's multiple safety violations, quality problems, productivity below expectations, and her refusal of assistance, Burger made the decision to terminate her employment with the approval of Senior Group Leader Steve Smith (Def. Ex. E, ¶ 10). When Burger completed Brannon's 75-day evaluation (see discussion in Section R(g)(2) below), he indicated that she had missed productivity four weeks in a row, meaning that Brannon missed productivity for the weeks ending April 27, May 4, May 11, and May 18. (Def. Ex. E, ¶ 10 & Ex. 2; Def. Ex. G ¶ 3 & Ex. 2).  Burger did not have the productivity information for the week ending May 25, 2002 (in which Brannon's productivity was over 100%) when he made the decision to terminate Brannon's employment; however, even if he had such information, he would not have changed his decision because the decision was based on factors other than productivity. (Def. Ex. E, ¶ 10; Def. Ex. G, ¶ 3 & Ex. 2).  Wagner did not participate in the decision to terminate

18

Brannon's employment (Def. Ex. B, pp. 100-101, 107-109).

The teammates reporting to Mark Wagner whose employment was terminated for failing to meet Target's expectations during their probationary period in 2002 were Frank Athangba (DOB 9/8/69, Age 32), Lana Flannagin (DOB 9/13/72, Age 29), John S. Gordon (DOB 4/14/66, Age 36), Shirley A. McLin (DOB 7/17/69, Age 33), Muriel J. Pickens (DOB 7/20/79, Age 22), Clint Ross (DOB 9/28/76, Age 25), and Thomas Shanley (DOB 5/17/76, Age 26) (Def. Ex. D, ¶ 2 & Ex. 1; Def. Ex. H, ¶ 4 & Ex. 3). Unlike the Plaintiff, who was given the opportunity to voluntarily resign, these employees were not afforded such an opportunity. (Def. Ex. H, ¶ 4). Out of the employees listed above, only  Athanga, Flannagin, Gordon, and McLin were terminated for failure to meet productivity standards. (See Pla.Evid.Sub., Exhibit H). None of the identified probationary employees ever broke the 100% productivity standard, as Gunn and Brannon did.

The teammates reporting to Mark Wagner who successfully completed their probationary period in 2002 and who were over the age of 40 are Ronald Jackson (DOB 8/20/58, Age 44) and Stephen Preston (DOB 4/7/58, Age 44) (Def. Ex. D, ¶ 2 & Ex. 1; Def. Ex. H, ¶ 5). The teammates reporting to Mark

Wagner who successfully completed their probationary period in 2002 and who were female are Michelle Duke, Leslie Hubbard, Jerrie Wray, and Traci Young (Def. Ex. H, ¶ 5).

In addition to Linda Brannon, discussed above, the teammates reporting to Todd Burger whose employment was terminated for failing to meet Target's expectations during their probationary period were Terry Davison (DOB 7/31/75, Age 26), Dana Francis (DOB 2/16/66, Age 36), Cedric Holloway (DOB 2/1/70, Age 32), Stephen Jackson (DOB 2/3/62, Age 40), James Powell (DOB 8/21/64, Age 37), and Lee Smith (DOB 10/16/81, Age 20) (Def. Ex. D, ¶ 2 & Ex. 1; Def. Ex. E, ¶ 17 & Ex. 9).  Out of the employees listed above, only Brannon, Francis, Holloway, Jackson, and Smith appear to have been terminated for "productivity" concerns.  (See Pla.Evid.Sub., Exhibit K).  Of these, only one employee ever broke the 100% productivity expectation mark. This employee was terminated immediately after reaching this goal, just as Gunn.  This employee was Linda Brannon, who was told, as Gunn was told, "Target does not think you are capable of maintaining your present level of productivity." The teammates reporting to Todd Burger who successfully completed their probationary period in 2002 and who were over the age of 40

20

are Phillip Hatfield (DOB 8/22/56, Age 45) and Shirley Scruggs (DOB 2/3/61, Age 41) (Def. Ex. D, ¶ 2 & Ex. 1; Def. Ex. E, ¶ 18).  The teammates reporting to Todd Burger who successfully completed their probationary period in 2002 and who were female are Tharnda Green, Tanya Lilly, Patricia Mallory, Aboline McCullough, Katrina Olinger, Shirley Scruggs, Felisha Taylor, Tracy Warren, Consuella Washington, and Antionette Wilson-bey (Def. Ex. E, ¶ 18).

## Alleged Comparators

### Mitch Hendrix and Phillip Maples

Plaintiff claims that Mitch Hendrix and Phillip Maples were treated differently than her because their trucks were "easier" to unload (Def. Ex. A, pp. 156-158, 160-161).   Both Hendrix and Maples exceeded Target's productivity expectations for their entire probationary period. (Def. Ex. G, ¶ 3 & Exs. 3-4; Def. Ex. H, ¶ 6).  Though Plaintiff believes that the easiest trucks were assigned to Hendrix and Maples, Plaintiff does not know what type of freight either worker was assigned during the time they worked at Target. (Def. Ex. A, pp. 171-172).  Warehouse Workers in the Inbound department are assigned to teams and these teams are then assigned a range of doors from one of the three docks in the department from which to unload trailers for a

particular shift. (Def. Ex. B, pp. 282-283; Def. Ex. E, ¶ 7).  The teams are assigned these ranges of doors through the use of a rotation sheet that is posted on the department bulletin board. (Def. Ex. B, pp. 281-282; Def. Ex. E, ¶ 7). The teams are rotated through the different docks so that a teammate does not always unload from trailers with the same type of freight mix. (Def. Ex. E, ¶ 7).  There are different standards set depending on the different type of freight that is being unloaded. (Def. Ex. B, pp. 273-276).  If freight can be characterized as "easier" to unload, the teammate is required to unload more of it per hour to meet the standard. (Def. Ex. B, pp. 274, 277).

### Anthony Grant

Wagner supervised Anthony Grant, who was not in his probationary period during 2002 as he had already completed this period.[11] (Def. Ex. B, pp. 83, 85).  After a team member completes their probationary period, Target typically does not counsel them on a weekly basis.  It follows its Corrective Action Policy. (Def. Ex. B, p. 85).  The Corrective Action Policy is a progressive disciplinary policy in which a teammate is provided with certain warnings before further discipline or termination for poor productivity. (Def.

---

[11] For the time period that Plaintiff was employed, Grant compiled the following productivity numbers: 61.15%, 126.52%, 61.23%, 55.04%, 64.16%, 68.84%, 77.28%, 66.47%, 60.59%, 107.32%, 99.45%.  (Pla.Evid.Sub., Vol. III, Exhibit E, Tab 29).

Ex. B, pp. 86-88; Def. Ex. D, ¶ 5).  In contrast to probationary employees whose productivity is reviewed on a weekly basis, non-probationary employees' productivity is reviewed for monthly trends, meaning that Grant's performance would not have been reviewed for the same time frame as the Plaintiff's performance.  (Def. Ex. B, p. 95).

### Terry Degraffenreid

Terry Degraffenreid (DOB 11/30/68, Age 33) was hired as a probationary employee in Inbound on June 18, 2002 and reported to Mark Wagner.  (Def. Ex. B, p. 116; Def. Ex. D, ¶ 2 & Ex. 1).  Degraffenreid reached the 100% goal only one (1) time during his probationary period, but was not terminated.  (Pla.Evid Sub., Vol. III, Exhibit E, p. 143).  The Defendant asserts that for the first seven weeks of Degraffenreid's employment, his productivity was not tracked because corporate failed to assign Degraffenreid a proper ID number for tracking his productivity. (Def. Ex. B, p. 111-112, 118).  Based on the fact that Target had seven weeks of missing data for Degraffenreid's probationary period, Wagner made the decision not to terminate Degraffenreid's employment for low productivity because he could not fairly evaluate Degraffenreid's entire probationary period. (Def. Ex. B, pp. 112, 126,

131, 143-144).  Wagner did not know Degraffenreid's age at the time he made this decision and Wagner would have given any other teammate the same consideration had they had the same amount of missing data. (Def. Ex. B, pp. 126, 131).

Plaintiff believes that the After the Fact Productivity Data for Degraffenreid's first seven weeks was not missing on or before August 8, 2002 because Wagner created a "45-day teammate appraisal" which contains the following notation: "your last two weeks productivity has been 10 to 15 percent below expectations.  Focus on establishing a steady pace to meet expectations."  Since Degraffenreid's date of hire is June 18, 2002, and no productivity allegedly existed for Degraffenried for the first seven weeks of his employment, Plaintiff believes Wagner would not have known that Degraffenreid's productivity was 10 to 15 percent below expectation for the last two weeks if he didn't rely on available After the Fact Productivity information.  (Pla.Evid Sub., Vol. III, Exhibit E, p. 143).

In addition, although Degraffenreid missed the 100% mark 5 times out of 6, between his "45-day evaluation" and "90-day evaluation," Wagner noted on his 90-day evaluation that "you have met productivity expectations during

24

the first 90 days." (Pla. Evid. Sub., Vol. III, Exhibit E, Tab 36).

### James Steven Free

Wagner supervised James Steven Free (DOB 4/2/68, Age 35) who was hired as a Warehouse Worker in the Inbound department on August 20, 2002. (Def. Ex. B, p. 156; Def. Ex. D, ¶ 2 & Ex. 1).  Free met the productivity standard of 100% only one (1) time during his probationary period.  During Free's probationary period, Free's wife was hospitalized a number of times for a possible fatal heart condition, and Wagner took this extenuating circumstance into consideration. Wagner believed that Free would be able to meet productivity expectations once Free's personal problems were resolved. (Def. Ex. B, pp. 158-162, 166, 304-305 & Ex. 40).  The Defendant asserts that Wagner did not know Free's age at this time and, just as he did for Free, he would take into consideration extenuating circumstances when making decisions regarding whether any teammate would complete the probationary period. (Def. Ex. B, p. 163; Def. Ex. H, ¶ 7).  Plaintiff believes that the special consideration extended to Free was not extended to all employees.   For instance, Plaintiff believes that Target's treatment of Linda Brannon, who was terminated not only after exceeding her productivity expectations, but also on

the day that she returned to work after her mother underwent surgery for a life-threatening condition, is an example of disparate treatment.  (Pla. Evid. Sub., Vol. I, Exhibit C, ¶ 7).  In fact, Brannon states that her supervisor was aware of this family illness, inasmuch as she was assured that Target's decision "has nothing to do with [her] mother being sick" (Pla. Evid. Sub., Vol. I, Exhibit C, ¶ 7).

### James Rice

James Rice (DOB 9/15/62, Age 40) began working as a Warehouse Worker in Inbound on September 20, 2002 under Wagner's supervision. (Def. Ex. B, p. 218; Def. Ex. B ¶ 2 & Ex. 1).  Rice met or exceeded his productivity during the first four weeks of his probationary period and, based on Rice's overall productivity trend, Wagner determined that Rice would complete his probationary period. (Def. Ex. B, pp. 220-221, 228 & Ex. 44).  Rice reached the 100% standard (106.07%) on one (1) occasion during his probationary period.  This occurred in the 4th week of his employment.  Thereafter, Rice did not break 100% again for the remainder of his probationary period.  Rice's "trend line" thereafter was as follows: 79.49%, 60.43%, 84.51%, 94.99%, 84.39%, 86.16%, and 82.20%.  Significantly, Rice's "trend line" in the 10th,

11th, and 12th weeks appears to hover in the 80% range.  ___

### Derrick Sherrill

Derrick Sherrill (DOB 5/7/1972, Age 30) reported to Mark Wagner after he became employed on August 20, 2002. (Def. Ex. B, p. 333).  Sherrill had the same complication with a delay in obtaining an ID number that Terry Degraffenreid experienced. (Def. Ex. B, p. 335; Def. Ex. G, ¶ 3).  One week during his probationary period, Sherrill was sick[12] and made efforts to come to work, but was not in production the entire week. (Def. Ex. B, p. 337).  During his probationary period, Sherrill met or exceeded productivity expectations 5 out of the first 9 weeks productivity was tracked, as compared to Plaintiff who met or exceed productivity expectations only 2 times out of the first 9 weeks. (Def. Ex. G, ¶¶  2-3,  Exs. 1, 8).

### Kent Johnson

Todd Burger supervised Kent Johnson (DOB 8/29/63, Age 38) who was an Inbound Warehouse Worker. (Def. Ex. B, p. 144; Def. Ex. D, ¶ 2 & Ex. 1; Def. Ex. E, ¶ 16).  Johnson met or exceeded productivity 5 out of the first 9

---

[12] Sherrill missed work on two occasions during his probationary period (Def. Ex. B, p. 338). With respect to attendance during the learning period, Target policy provides that any combination of *three* (which Sherrill did not reach) absences or tardies may result in termination; however, personal circumstances resulting in absences or tardies are reviewed and evaluated on an individual basis (Def. Ex. B, pp. 338-339; Def. Ex. D, ¶ 4 & Ex. 4).

weeks that productivity was tracked. (Def. Ex. E, ¶ 16 & Ex. 8; Def. Ex. G, ¶ 3 & Ex. 9). During his probationary period, Johnson took on the additional assignment of replenishing the Inbound department with supplies, such as calculators, box knives, and the like. (Def. Ex. E, ¶ 16). This extra assignment took several hours to complete in a shift (Def. Ex. E, ¶ 16). Normally, when a teammate takes on an additional duty like this, the Group Leader deducts this time so that the extra assignment does not impact on the teammates' percentage of standard productivity (Def. Ex. E, ¶ 16). However, with Johnson, there were times that his Group Leader Burger neglected to deduct this extra time and it affected Johnson's productivity negatively. (Def. Ex. E, ¶ 16). Burger made a mental note that Johnson's productivity was off due to Burger's error in not inputting the hours properly (Def. Ex. E, ¶ 16).

### Reginald Corbitt

For a period of time, the Group Leaders utilized an informal 75-day evaluation to assess the performance of probationary teammates toward the end of the teammate's learning period. (Def. Ex. B, pp. 45; Def. Ex. C, pp. 89, 94; Def. Ex. E, ¶ 6). These evaluations were informal and were not shared with the teammates. (Def. Ex. C, pp. 88-89; Def. Ex. E, ¶ 6). The Group Leaders in

Inbound did not complete 75-day evaluations for every teammate and, in fact, there was at least one group of teammates who were hired on June 18, 2002 for whom the Group Leaders did not complete 75-day reviews. (Def. Ex. E, ¶ 6). At that time, the Inbound department had hired more groups of teammates than in the past as they hired groups on June 5, 2002, June 18, 2002, and July 16, 2002. (Def. Ex. E, ¶ 6). Additionally, Todd Burger was out for a number of weeks during this time period to attend training out of state and for vacation. (Def. Ex. E, ¶ 6).

Reginald Corbitt (DOB 6/9/74, Age 28) was supervised by Burger and Corbitt met or exceeded productivity expectations for 5 out of 9 of the first weeks productivity was tracked. (Def. Ex. B, pp. 194, 198; Def. Ex. D, ¶ 2 & Ex. 1; Def. Ex. E, ¶ 11; Def. Ex. G, ¶ 3 & Ex. 10). Corbitt was in the group of teammates for whom Burger did not complete a 75-day evaluation. (Def. Ex. E, ¶ 11). Since Burger did not have the opportunity to complete a 75-day evaluation for Corbitt and the other employees in this group of hires, Burger could not catch or address performance issues with this group that might have led to the termination of their employment during the probationary period. (Def. Ex. E, ¶ 11). Additionally, when it came time to conduct the 90-day

29

performance appraisal for Corbitt (and other employees hired in this group), Corbitt had already completed his first 90 days at Target. (Def. Ex. E, ¶ 11). Corbitt was hired on June 18, 2002 and his 90 days were completed on September 18, 2002. (Def. Ex. E, ¶ 11). Reginald Corbitt (28 year old, male) did not reach the 100% productivity mark until his 10th week of employment. In fact, Corbitt reached the expected 100% productivity standard only 3 times in his probationary period (Pla. Evid. Sub., Vol. III, Exhibit E, Tab 43). However, Burger did not complete Corbitt's review until September 25, 2002, at least one full week after the 90 day period ended. (Def. Ex. E, ¶ 11).

Once a probationary employee completes their 90 days, they are subject to Target's Correction Action policy, which is a progressive disciplinary policy. (Def. Ex. B, ¶ 5; Def. Ex. E, ¶ 11). Even if a teammate is not performing up to expectations, if Target neglects to complete a 90-day review during the first 90-days, Target cannot terminate the teammate for failing to complete the 90-day period and Target is required to proceed under the Corrective Action policy to administer any discipline or termination. (Def. Ex. B, ¶ 5; Def. Ex. E, ¶ 11). Therefore, even though Corbitt was not meeting productivity expectations, Burger could not terminate his employment for

failing to successfully complete the 90-day period because Corbitt had in fact already completed this period. (Def. Ex. E, ¶ 11 & Ex. 3).

**Patricia Mallory**

Patricia Mallory (DOB 1/19/65, Age 37) reported to Todd Burger starting on June 18, 2002. (Def. Ex. B, pp. 228-229, 231; Def. Ex. D, ¶ 2 & Ex. 1; Def. Ex. E, ¶ 12).   Probationary employee Mallory reached the 100% productivity mark in her 10th week of employment, but was allowed to remain employed.  Her productivity for the 2 weeks preceding her 10th week equaled 53.29% and 60.76%.  Her productivity for the 3 weeks following the 10th week equaled 43.46%, 80.97% and 45.13%. (Pla. Evid. Sub., Vol. III, Exhibit E, Tab 45).  However the Defendant asserts that, just as with Reginald Corbitt, Burger failed to complete either a 75-day or a 90-day evaluation for Mallory until after she had actually worked 90 days. (Def. Ex. E, ¶ 12 & Ex. 4).  Burger could not have terminated Mallory's employment because she had neglected to complete the 90-day review within the first 90 days that she worked with Target.  (Def. Ex. E, ¶ 12 & Ex. 4).

**Shirley Shruggs**

For the first portion of her 90-day probationary period, Mark Wagner

supervised Shirley Scruggs.  (DOB 2/3/61, Age 41) (Def. Ex. B, pp. 238-239;

Def. Ex. D ¶ 2 & Ex. 1).  Wagner provided Scruggs with her 45-day evaluation

and indicated that Scruggs was meeting expectations.  (Def. Ex. B, pp. 240-241

& Ex. 46).  After reporting to Wagner for the first half of her probationary

period, Scruggs began reporting to Todd Burger. (Def. Ex. B, pp. 242, 247;

Def. Ex. E, ¶ 15).  On her 75-day evaluation, Burger noted that Scruggs met

productivity expectations 5 out of 8 weeks. (Def. Ex. E, ¶ 15 & Ex. 7).  Burger

observed that Scruggs was exceptional in the area of safety and that Scruggs,

in addition to being vocal in start-up meetings about safety, volunteered to join

the General Safety Team. (Def. Ex. E, ¶ 15).  During her probationary period,

Scruggs was assigned to a newly formed specialized team that started working

a designated type of trailer in August of 2002. (Def. Ex. E, ¶ 15).  Since  the

freight was more difficult to unload on these designated trailers, if a teammate

made 75% productivity that was considered meeting expectations (Def. Ex. E,

¶ 15).  When Burger completed Scruggs' 90-day evaluation, he indicated that

Scruggs had met productivity expectations 7 out of 11 weeks, referring to her

first 5 weeks of tracked productivity, as well as the weeks ending 8/24 and

8/31, during which Scruggs made over 75% on the newly-formed team. (Def.

Ex. E, ¶ 15).  Probationary employee Shirley Scruggs (42 years old, female) did not reach the 100% productivity mark until her 12th week of employment (Pla. Evid. Sub., Vol. III, Exhibit E, Tab 46).  Plaintiff was terminated in her 10th week of employment after reaching the 100% mark in her 9th (and last full) work week.  However, the Defendant asserts that, just as with teammates Mallory and Corbitt, Burger neglected to complete the 90-day Performance Appraisal for Scruggs until after she had completed her probationary period. (Def. Ex. E, ¶ 15 & Ex. 7).  Therefore, even assuming Scruggs was not performing up to expectations, Burger would not have been able to terminate her employment for failing to complete the probationary period. (Def. Ex. E, ¶ 15 & Ex. 7).

### Marchas Williams

Marchas Williams (DOB 8/22/79, Age 23) was an Inbound teammate reporting to Todd Burger starting in September of 2002. (Def. Ex. D, ¶ 2 & Ex. 1; Def. Ex. E, ¶ 14).  Williams met Target's productivity expectations for 6 out of the first 9 weeks that productivity was tracked. (Def. Ex. E, ¶ 14 & Ex. 6; Def. Ex. G, ¶ 3 & Ex. 12).  Although Williams's productivity slipped below expectations a few weeks during his probationary period, Williams's overall

productivity trend and his performance in other areas met Target's expectations. (Def. Ex. E, ¶ 14).  As with Corbitt and the other teammates identified above, Burger failed to complete the 90 day review during Williams's first 90 days with Target and as such, Burger would not have been able to terminate his employment for failure to successfully complete the probationary period. (Def. Ex. E, ¶ 16).

### Derek Crowell

Derek Crowell (DOB 6/28/63, Age 38) was a teammate in Inbound who reported to Burger starting in June of 2002. (Def. Ex. D, ¶ 2 & Ex. 1; Def. Ex. E, ¶ 13).  For the first two weeks that Target tracked Crowell's productivity, he exceeded expectations and then for the following two weeks he fell below expectations.  (Def. Ex. E, ¶ 13; Def. Ex. G, ¶ 3 & Ex. 13).  Burger issued Crowell's 45-day Performance Appraisal to him on August 21, 2002. (Def. Ex. E, ¶ 13 & Ex. 5).  After that week, Crowell's productivity for the next five weeks was 121.76%, 120.90%, 93.30%, 65.80%, and 98.74%. (Def. Ex. E, ¶ 13 & Ex. 5; Def. Ex. G, ¶ 3 & Ex. 13).  Crowell was in the same group of teammates, like Corbitt and Mallory, for whom Burger neglected to complete a 90-day review in time and, as explained, Burger would not have been able to

34

terminate Crowell's employment for failing to complete the probationary period at that time. (Def. Ex. E, ¶ 13).

## IV.  Applicable Substantive Law and Analysis

Plaintiff asserts that Target discriminated against her on the basis of age and gender by terminating her employment and subjecting her to disparate treatment in the terms and conditions of her employment.  In support of this claim, Plaintiff points to the alleged comment of Mark Wagner that he did not believe that Plaintiff was "physically capable" of maintaining Target's productivity expectations as evidence of age and gender discrimination (Def. Ex. A, p. 132).  The analysis of the Plaintiff 's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims.  See Standard, 161 F.3d at 1330 (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).  A plaintiff's ability to proceed

through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is "[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption."  Burns v. Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990).; Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition);   See, e.g., Bass v. Board of County Commissioners, 256 F.3d 1095, 1111 (11th Cir. 2001) (the term "direct evidence," when used in the context of a Title VII race discrimination claim, "refers to a type of evidence which, if true, would require no inferential leap in order for a court to find discrimination").

In the present case, Wagner's comment that he did not believe Plaintiff was "physically capable" of meeting Target's productivity standards does not

rise to the level of direct evidence of age or gender discrimination.  Wagner's comment would require an inferential leap and presumption in order for the Court to find discrimination.  In <u>Castle v. Sangamo Weston, Inc.</u>, 837 F.2d 1550 (11th Cir. 1988), the Eleventh Circuit explained that an example of direct evidence of age discrimination is a piece of paper reading "Fire Rollins – she is too old."  <u>Castle</u>, 837 at 1558 n.13.  Wagner's comment is not similar to this example of direct evidence.  The Eleventh Circuit case of <u>Barnes v. Southwest Forest Industries, Inc.</u>, 814 F.2d 607 (11th Cir. 1987) involved the alleged remark by a personnel manager to a terminated security guard that in order to transfer "you would have to take another physical examination and at your age, I don't believe you could pass it."  <u>Barnes</u>, 814, F.2d at 610-611.  The <u>Barnes</u> court noted that though such a comment "may have been inappropriate and condescending, it is not the sort of evidence that this circuit has recognized as being direct evidence of discrimination."  <u>Id</u>.  The court explained that the comment was merely an opinion of the plaintiff's physical condition and that "Congress made plain that the age statute was not meant to prohibit employment decisions based on factors that sometimes accompany advancing age, such as declining health or diminished vigor and competence."  <u>Id</u>.; <u>See</u>

also Loeb v. Textron, Inc., 600 F.2d 1003, 1016 (1st Cir. 1979); Holley v.

Sanyo Mfg., Inc, 771 F.2d 1161, 1166-67 (8th Cir. 1985).

In Young v. General Foods Corp., 840 F.2d 825 (11th Cir. 1988), the

Court found that comments that the plaintiff-employee lacked the wherewithal

to perform a particular job, moved in slow motion, and was not proactive or

aggressive, at most referred only to characteristics sometimes associated with

increasing age. Young, 840 F.2d at 829. The Young court held that the alleged

comments did not constitute direct evidence of discrimination. Id.; See also

Bonham v. Regions Mortgage, Inc., 129 F. Supp. 2d 1315, 1322 (M.D. Ala.

2001) (holding that decisionmaker's alleged statements during job interview

that plaintiff was "getting real old" and that, because of her age, she might have

to "stop staying up so late and partying at night," did not constitute direct

evidence of age discrimination).   Accordingly, the Court finds that the

Defendant's alleged comment that Plaintiff Gunn was not "physically capable"

of meeting the Defendant's productivity standards does not rise to the level of

direct evidence of age or gender discrimination.

A plaintiff asserting a cause of action under either Title VII, the Age

Discrimination  in  Employment  Act  ("ADEA"),  or  the  Alabama  Age

38

Discrimination in Employment Act ("AADEA") bears the initial burden of establishing a prima facie case of discrimination. See Busby v. City of Orlando, 931 F.2d 764, 777 (11th Cir. 1991); Goldstein v. Manhattan Industries, Inc., 758 F.2d 1435, 1442 (11th Cir. 1985).  In the absence of direct evidence as in Plaintiff Gunn's case, a plaintiff must establish a prima facie case of discrimination in order to recover for wrongful termination by demonstrating that (1) she belongs to a protected class, (2) she was subjected to an adverse job action, (3) she was qualified to perform her job, and (4) either defendant replaced her with someone outside the protected class or defendant treated similarly-situated employees outside the protected class more favorably.  See Holifield v. Reno, 115 F.3d 1555, 1 561-62 (11th Cir. 1997); Turlington v. Atlanta Gas Light Co., 135 F.3d 1428, 1432 (11th Cir. 1998), cert. denied, 525 U.S. 962 (1998).; see also Ashley v. Southern Tool, Inc., 201 F. Supp. 2d 1158, 1165 (N.D. Ala. 2002).

Plaintiff Gunn can establish the first element of a prima facie case of age and gender discrimination because she is a female over the age of 40.  Plaintiff alleges that she was subjected to an adverse employment because she was terminated by the Defendant.  The Defendant asserts that Plaintiff voluntarily

resigned and was offered an opportunity to seek other positions in different departments at Target. The Defendant provided evidence of a voluntary termination request that was executed by the Plaintiff. Plaintiff alleges that she was forced to either voluntarily resign or be terminated by the Defendant. Assuming the facts in the light most favorable to Plaintiff Gunn at the summary judgment stage, the Court finds that Plaintiff Gunn was terminated, resulting in an adverse employment action.

The Defendant asserts that Plaintiff Gunn cannot establish that she was qualified to perform the job because she failed to meet Target's productivity standards. Plaintiff asserts that all the productivity information relied on by the Defendant was inaccurate. In fact, Plaintiff produced evidence that productivity information provided by the Defendant for three of the weeks Plaintiff was evaluated was wrong. Plaintiff asserts that the Defendant intentionally provided inaccurate production information as it relates to her probationary period. Plaintiff asserts that all of the productivity information is wrong as it relates to her. Plaintiff contends that because the Defendant inaccurately recorded her weekly productivity for three weeks and did not make a correction until she made the Defendant aware of the inaccurate

information and provided the Defendant with copies of her weekly productivity for those periods during discovery, a genuine issue of material fact exists as to Plaintiff Gunn's qualifications.  In addition, Plaintiff provided evidence that she satisfied all other areas considered by the Defendant  as it relates to an employee's qualifications in the Inbound department during their probationary period, including but not limited to, good attitude, good attendance record, awareness of safety rules,  and teamwork .

The Court finds that Plaintiff Gunn has raised a genuine issue of material fact as to whether she was qualified.  Although, for the purpose of employment discrimination cases, an employee is considered to be "qualified" for a position if he or she meets the criteria that the employer has articulated for the position, the Plaintiff has cast doubt on the weekly productivity information used by the Defendant to ascertain the productivity and qualifications of Plaintiff Gunn. See Wright v. Southland Corp., 187 F.3d 1287, 1300 n.16 (11th Cir. 1999) (citing Thornley v. Penton Publishing, Inc., 104 F.3d 26, 29 (2d Cir. 1997). Accordingly, the Defendant's motion for summary judgment is due to be denied.

## V. Conclusion

41

_____For the reasons set forth above, the Defendant's motion for summary judgment is **DENIED** as to Plaintiff Gunn's discrimination claims.

**DONE** and **ORDERED** this 26th day of January, 2006.

**VIRGINIA EMERSON HOPKINS**
United States District Judge